UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

JEFFREY RODRIGUEZ,

Petitioner,

v.

JOHN HENLEY, *et al.*,

Respondents.

Case No. 3:24-cv-00182-MMD-CLB

ORDER

**I.      SUMMARY**

Petitioner Jeffrey Rodriguez was sentenced in Nevada state court to life with the possibility of parole for his convictions of murder with a deadly weapon, three counts of assault with a deadly weapon, and felon in possession of a firearm. (ECF No. 22-12.) This matter is before the Court for adjudication of the merits of the remaining[1] claims in Rodriguez's *pro se*[2] Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 ("Petition"), in which he alleges that his trial counsel failed to call an expert witness, his waiver of his right to testify was not knowingly made, and the trial court allowed prejudicial evidence to be admitted. (ECF No. 7.) Respondents answered the Petition, and Rodriguez replied. (ECF Nos. 45, 47.) For the reasons discussed below, the Court denies the Petition and denies a Certificate of Appealability.

[1] The Court previously dismissed grounds 1, 2, 3a, 3b, 4, 5, 6, 7b, 8, 9, 10, 11a, 11c, 11d, 12, 13, and 14. (ECF No. 42.)

[2] Notably, in its Screening Order, the Court stated that Rodriguez may be entitled to the appointment of counsel given his life sentence and the complex issues presented in his Petition. (ECF No. 6 at 2 & n.2.) The Court instructed Rodriguez to file a motion if he desired for the Court to consider appointing counsel to represent him. (*Id.*) Rodriguez never filed such a motion.

## II.     BACKGROUND

### A.     Factual Background[3]

Mitchell Costa testified that, at around 2:15 a.m. on July 9, 2012, he and his girlfriend were driving north on the interstate in Washoe County, Nevada when they saw that two mini vans had collided and were stopped in the median. (ECF No. 21-48 at 38-43, 63.) Costa pulled his vehicle over to assist. (*Id.* at 41.) Costa exited his vehicle and asked the woman, who was driving a silver van that had sustained heavy damage to the passenger side, and the man, who was driving a darker-colored van, if they were okay. (*Id.* at 45-46.) The woman was on her cell phone at the time, and Costa heard her say that she needed the police because her "husband just tried to run [her] off the road." (*Id.* at 47.) Because both the man and woman indicated that they were okay, Costa went back to his vehicle, and after talking to his girlfriend, he saw the man walk from the front of his van to the driver's-side door of his van. (*Id.* at 49-50.) Costa then saw the man walk over to the woman and heard three gunshots. (*Id.* at 51.)

The man-made eye contact with Costa and raised his arm in Costa's direction, so Costa "hit the throttle to get out of there." (*Id.* at 52.) At that point, Costa realized another vehicle had pulled onto the scene. (*Id.* at 53.) As he was driving away, with the other car now following him, Costa "hear[d] three more gunshots." (*Id.* at 52-53.) Costa took the next exit from the interstate and then got back on the interstate heading south. (*Id.* at 54.) As Costa passed the scene, he saw that the dark-colored van was gone, and the woman was lying face down in the dirt. (*Id.* at 54.) Costa parked behind the silver van and tried to comfort the woman, who still had a weak pulse. (*Id.* at 55.) After police and medics arrived and Costa and his girlfriend retreated to their vehicle, Costa saw the dark-colored van come back to the scene, and Costa "start[ed] yelling at the cops that the man

---

[3]The Court makes no credibility or other factual findings regarding the truth or falsity of the evidence from the state court. The Court's summary is merely a backdrop to its consideration of the issues presented in the Petition.

2

[had] . . . came back." (*Id.* at 60.) The man exited his van, and Costa confirmed that he was the shooter. (*Id.* at 61.) The police took the man into custody. (*Id.* at 62.)

Christopher Michael Stockton testified that he took a break at 2:00 a.m. on July 9, 2012, from his graveyard shift at Mal-Mart. (ECF No. 21-48 at 84-86.) Stockton saw what he believed to be an accident on the interstate, and he went to help. (*Id.* at 89.) "As [Stockton] was pulling off onto the dirt, [he] was getting ready to slow down, roll down [his] window to see if [he] could help, and then [he] heard shots and [he] saw [a man] shooting at the car" that had stopped in front of him. (*Id.* at 92.) The man then "moved his arm towards [Stockton] and then shot at [Stockton]." (*Id.* at 93.) Stockton "ducked and took off." (*Id.* at 94.)

The woman who was shot was identified as Korinda Rodriguez, and the man was identified as Jeffrey Rodriguez. (ECF No. 21-49 at 38, 42.) Korinda was pronounced dead at the scene. (*Id.* at 80.) The Washoe County Medical Examiner testified that "Korinda Rodriguez died due to multiple gunshot wounds of the chest and abdomen." (*Id.* at 201.)

While preparing to be driven to the police station, Rodriguez told an officer that "he regretted doing that to her, but she had been getting into drugs and openly sleeping around with other guys and she was going to move their children into a drug home." (ECF No. 21-49 at 51-52.) Rodriguez later told that same officer at the police station that "he should have made [them] shoot him for what he had done." (*Id.* at 56.) Later, during his interview with a detective, Rodriguez said that he and Korinda, his wife, were both leaving in their respective vehicles at around 2:00 a.m. that morning to go to work, they were having an argument at that time, Korinda drove to a gas station, Rodriguez followed her and tried to continue their argument, Rodriguez followed Korinda after leaving the gas station, Korinda was not answering his telephone calls, he "chas[ed] after her using his vehicle to run her vehicle off the road," the argument continued, and Rodriguez got the gun from his glovebox and shot Korinda. (ECF No. 21-50 at 15-17.)

3

## B.      Procedural Background

A jury found Rodriguez guilty of the murder of Korinda with the use of a deadly weapon and three counts of assault with a deadly weapon for shooting at Costa, Costa's girlfriend, and Stockton. (ECF No. 22-12.) The trial court then found Rodriguez guilty of being a felon in possession of a firearm. (*Id.*) Rodriguez was sentenced to (1) life with the possibility of parole after 20 years for the murder conviction with a consecutive sentence of 72 to 180 months for the deadly weapon enhancement, (2) consecutive terms of 24 to 60 months for each of the assault convictions, and (3) a concurrent term of 12 to 60 months for the felon in possession of a firearm conviction. (*Id.*) Rodriguez appealed, and the Nevada Supreme Court affirmed on December 18, 2015. (ECF No. 22-37.)

Rodriguez filed a state habeas petition on February 2, 2017. (ECF No. 22-43.) The state court denied the petition on March 20, 2023. (ECF No. 24-13.) Rodriguez appealed, and the Nevada Court of Appeals affirmed on March 25, 2024. (ECF No. 24-35.) Remittitur issued on April 29, 2024. (ECF No. 24-37.)

Rodriguez commenced this instant action on or about April 23, 2024. (ECF No. 1.) The Court conducted an initial review of the Petition and ordered that it be served on Respondents. (ECF No. 6.) Rodriguez raised the following grounds in his Petition:

1.     His trial counsel failed to provide continuous representation at all stages of the trial process.
2.     His trial counsel failed to investigate and prepare for trial.
3.     His trial counsel failed to call, secure, or subpoena any witnesses for trial, including (a) Edgar Rodriguez, (b) defending against the prosecutor's testimony, and (c) Martha Mahaffey, PhD.
4.     His trial counsel failed to impeach prosecution witnesses.
5.     His trial counsel failed to object to fabricated evidence presented by the prosecution.
6.     His trial counsel misstated key facts in his closing argument.
7.     His trial counsel's advice deprived him of his right to testify due to (a) his waiver of his right to testify not being knowingly made and (b) his decision was impaired by the levels of Depakote in his system.
8.     His trial counsel failed to lodge a sufficient objection to the admission of highly prejudicial character evidence.
9.     His appellate counsel was ineffective.
10.    The prosecution committed misconduct.

4

11. There was judicial misconduct, including (a) not granting a continuance of the trial, (b) allowing prejudicial character evidence that he was a sex offender to be admitted at trial, (c) being subjective towards the jury panel during voir dire, and (d) showing favoritism towards the prosecution.
12. He was incompetent during his trial.
13. There was insufficient evidence to support his first-degree murder conviction; instead, there was only sufficient evidence to prove voluntary manslaughter.
14. The cumulative errors of grounds 1 through 13 warrant the granting of relief.

(ECF No. 7.)

Respondents moved to dismiss the Petition. (ECF No. 28.) Rodriguez opposed the motion, and Respondents replied. (ECF Nos. 33, 40.) The Court granted the motion, in part, dismissing grounds 1, 2, 3a, 3b, 4, 5, 6, 7b, 8, 9, 10, 11a, 11c, 11d, 12, 13, and 14. (ECF No. 42.) Respondents filed an answer to the remaining grounds—grounds 3c, 7a, and 11b—and Rodriguez replied. (ECF Nos. 45, 47.)

## III.   STANDARD OF REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court."

5

*Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires "[t]he state court's application of clearly established law [to] be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102; *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state court rulings, which demands that state court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

## IV.   DISCUSSION

### A.   Ground 3c: Ineffective Assistance of Counsel Regarding Expert

In ground 3c, Rodriguez alleges that his trial counsel failed to call expert witness Martha B. Mahaffey, Ph.D. (ECF No. 7 at 31.)

#### 1.   Background information

Rodriguez was represented by Jennifer Lunt, but a month before his trial, Rodriguez requested that new counsel be appointed, resulting in John Ohlson taking over.

///

///

6

Lunt referred Rodriguez to Dr. Mahaffey for a pre-trial psychological evaluation.[4] (*See* ECF No. 22-43 at 323.) Dr. Mahaffey diagnosed Rodriguez with Posttraumatic Stress Disorder, Panic Disorder, Major Depressive Disorder, and Avoidant and Antisocial Features. (*Id.* at 339.) Dr. Mahaffey's conclusions included the following: (1) "Rodriguez is an individual of average intelligence who was raised in a severely dysfunctional family with multiple childhood traumas," (2) his "upbringing took a toll on [his] self-esteem, his ability to develop adequate coping skills, his ability to form healthy, stable relationships, and his mental health," (3) "[c]onsistent with a rage reaction, [Rodriguez] experienced some symptoms of dissociation including feelings as if he were 'in a daze,' feeling as if 'everything was like a dream, kind of like being aware but not in full control,' feeling 'numb,' and being absent full memory for all that transpired," (4) Rodriguez's "account suggested that [his] acts of murder and assault were acts of reactive violence and not proactive violence," (5) "[r]eactive violence is defined as impulsive, hostile, and/or affective violence, typically in response to a perceived threat or provocation (real or imagined)," (6) when experiencing reactive violence, "the individual experiences intense autonomic arousal and emotion and reacts in an attempt to reduce the threat," and (7) "Rodriguez is extremely remorseful for having murdered his wife and having assaulted the innocent bystanders." (*Id.* at 339-41.)

At his post-conviction evidentiary hearing, Rodriguez testified that Lunt told him that the defense "could have [Dr. Mahaffey] testify, but that . . . it wouldn't change anything as far as the outcome goes." (ECF No. 24-12 at 21.) Nevertheless, Rodriguez wanted Mahaffey to testify because (1) he "felt [her report] gave the most accurate description of

---

[4]Because Rodriguez failed to provide the Nevada appellate courts with a copy of Dr. Mahaffey's report, the Court is precluded from considering it. *See Pinholster*, 563 U.S. at 181 (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"). Nonetheless, the Court includes it here for the sake of clarity given that it provides context for the post-conviction evidentiary hearing testimonies.

the events that transpired," (2) "she identified reactive violence as the type of violence in this case," meaning "violence without the malice aforethought," and (3) her testimony would have "supported the fact that there was no premeditation in the case." (*Id.* at 22-23.) Later, Ohlson told Rodriguez that he "couldn't use" Dr. Mahaffey. (*Id.* at 26.)

Lunt testified at the post-conviction evidentiary hearing that she "would [have] argu[ed] heat of passion and . . . would have [had] . . . Dr. Mahaffey testify, because she did an evaluation that would have helped support that." (ECF No. 24-12 at 85.) This assessment by Lunt was due to Dr. Mahaffey's statement that Rodriguez's "mental state at the time may have prevented him from being able to form the intent to kill." (*Id.* at 87.) Nonetheless, Lunt testified that she "didn't expect it to be successful and the State would be able to show premeditation" given the following facts: Rodriguez "took a gun out of the glove box and put it in his pocket, walked towards [Korinda], they had words, he turned around and walked away, and then he turned back around and without saying another word he shot her three times." (*Id.* at 85, 88.) Contrarily, Rodriguez's heat of passion defense was limited to the following: Korinda "threatened to call the cops and say that [Rodriguez] was in possession of firearms" and told Rodriguez that "the children had already met [her affair partner] and that he had played with [the children], and that she was going to leave [Rodriguez] and he would never get custody of the kids because he was a sex offender." (*Id.* at 89.)

Ohlson testified at the post-conviction evidentiary hearing that he lacked "any independent recollection of Mr. Rodriguez asking [him] if [he] were going to call Dr. Mahaffey," but that he "would [have] be[en] disinclined to call Dr. Mahaffey to the stand, because [he had] seen her on the stand before and used her before and [he] was never impressed." (ECF No. 24-12 at 104, 111.) According to Ohlson, Dr. Mahaffey's opinion "would have to have been something superb . . . for [him] to put her on the stand. (*Id.* at 111.) Ohlson also testified that he believed that the prosecution's argument that

8

Rodriguez premeditated the murder of Korinda when he left his confrontation with her to go to his car and retrieve the handgun "was pretty difficult to get over." (*Id.* at 96.)

### 2.    Standard For Ineffective Assistance of Counsel Claims

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that counsel's "representation fell below an objective standard of reasonableness," and (2) that counsel's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering an ineffective assistance of counsel claim must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. In reviewing a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply, so review is doubly deferential. *See Richter*, 562 U.S. at 104-05. Accordingly, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 105.

### 3.    State Court Determination

In deciding this claim, the Nevada Court of Appeals held:

> Rodriguez argues the district court erred by denying his claims of ineffective assistance of counsel. To demonstrate ineffective assistance of trial counsel, a petitioner must show counsel's performance was deficient in that it fell below an objective standard of reasonableness and prejudice

resulted in that there was a reasonable probability of a different outcome absent counsel's errors. *Strickland v. Washington,* 466 U.S. 668, 687-88 (1984); *Warden v. Lyons,* 100 Nev. 430, 432-33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland).* Both components of the inquiry must be shown, *Strickland,* 466 U.S. at 687, and the petitioner must demonstrate the underlying facts by a preponderance of the evidence, *Means v. State,* 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004). We give deference to the district court's factual findings if supported by substantial evidence and not clearly erroneous but review the court's application of the law to those facts de novo. *Lader v. Warden,* 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).

Rodriguez claimed that counsel should have called Dr. Mahaffey to testify in support of a heat-of-passion defense. Dr. Mahaffey conducted a psychological evaluation of Rodriguez before trial. Rodriguez claimed that based on the conclusions Dr. Mahaffey reached in her report, her testimony would have supported his contention that his actions constituted manslaughter and not first-degree murder.

After conducting an evidentiary hearing regarding this claim wherein Rodriguez, Ms. Lunt, and Mr. Ohlson testified, the district court found that Mr. Ohlson did not believe Dr. Mahaffey would be helpful as a testifying witness and that neither counsel believed a heat-of-passion defense was a viable strategy based on the facts of the case. These findings are supported by the record. Mr. Ohlson testified that he did not recall reviewing Dr. Mahaffey's report but speculated that he would have been disinclined to call her to testify because he was "never impressed" with her testimony. He also testified that he thought that the State's ability to prove premeditation "was pretty difficult to get over." Ms. Lunt testified that while she would have called Dr. Mahaffey to testify, she did not believe Dr. Mahaffey's testimony would result in a manslaughter conviction because the State had a really strong case and the facts supported a first-degree murder conviction. Dr. Mahaffey was not called to testify at the evidentiary hearing.

[FN3] Rodriguez did not provide this court with a copy of Dr. Mahaffey's report for our review on appeal. Accordingly, we presume the report supports the district court's decision. *See Cuzze v. Univ. & Cmty. Coll. Sys. of Nev.,* 123 Nev. 598, 603, 172 P.3d, 131, 135 (2007); *see also Greene v. State,* 96 Nev. 555, 558, 612 P.2d 686, 688 (1980) ("The burden to make a proper appellate record rests on appellant."); *accord* NRAP 30(b)(3).

In light of these circumstances, Rodriguez failed to demonstrate that counsel's actions were objectively unreasonable or a reasonable probability of a different outcome at trial had counsel called Dr. Mahaffey to testify. Therefore, we conclude the district court did not err by denying this claim.

(ECF No. 3-4.)

### 4.    Analysis

The Nevada Court of Appeals reasonably determined that Rodriguez failed to show that his trial counsel's "representation fell below an objective standard of reasonableness." *See Strickland*, 466 U.S. at 688. The Court acknowledges that Lunt

10

was planning on calling Dr. Mahaffey to testify and that Ohlson made the opposite decision not to call her. The Court also acknowledges that Dr. Mahaffey's report would have provided evidence in support of Rodriguez's argument that his murder of Korinda was not premeditated. However, it appears that Ohlson likely[5] made a tactical decision not to call Dr. Mahaffey. According to Ohlson, he "was never impressed" by Dr. Mahaffey. This strategic decision not to a call an expert witness whom trial counsel deemed from prior experience to be unimposing was reasonable and is entitled to deference. *See Strickland*, 466 U.S. at 688 (explaining that "[j]udicial scrutiny of counsel's performance must be highly deferential"); *see also Correll v. Ryan*, 539 F.3d 938, 948 (9th Cir. 2008) ("[U]nder *Strickland*, we must defer to trial counsel's strategic decisions.").

The Nevada Court of Appeals also reasonably determined that Rodriguez failed to show that, even if his trial counsel's performance was deficient, "there is a reasonable probability that . . . the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694. Mr. Mahaffey would have testified that Rodriguez's account of the events suggested that he acted with reactive violence, meaning on impulse. Importantly, however, this testimony appears to be at least partially biased in favor of Rodriguez given that it was based on Rodriguez's version of the events that took place in the days and hours leading up to the murder. Moreover, it is mere speculation that the jury would have credited Dr. Mahaffey's viewpoint that Rodriguez acted under the heat of passion rather than the prosecutor's viewpoint that Rodriguez premeditated the killing given the following facts: Rodriguez walked back to his van, retrieved the gun from the glovebox, walked about to Korinda's van, and then shot her to death. *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("*Strickland* prejudice is not established by mere speculation."). Indeed, the speculative nature of Dr. Mahaffey's testimony on the result of Rodriguez's trial is supported by Lunt's candid testimony that, although she planned on calling Dr. Mahaffey,

---

[5]When asked about Dr. Mahaffey, Ohlson testified that he did not recollect at the time of the post-conviction evidentiary hearing having read her report years earlier.

she did not believe Dr. Mahaffey's testimony would have swayed the jury and by Ohlson's testimony that the prosecution's premeditation argument was unyielding.

As such, the Nevada Court of Appeals' determination that Rodriguez failed to show that his trial counsel acted deficiently or that resulting prejudice constituted an objectively reasonable application of *Strickland*'s performance and prejudice prongs. Thus, Rodriguez is not entitled to federal habeas relief for ground 3c.

**B.    Ground 7a: Ineffective Assistance of Counsel Regarding Testifying**

In ground 7a, Rodriguez alleges that his trial counsel's erroneous advice resulted in his waiver of his right to testify not being knowingly made. (ECF No. 7 at 48.)

**1.    Relevant Background**

At the trial, outside the presence of the jury, the trial court asked Rodriguez whether he "had an ample opportunity to consider whether or not to testify as a witness in this trial." (ECF No. 21-50 at 52.) Rodriguez stated that he had and that he had "[m]ade a decision not to testify." (*Id.* at 52–53.) The trial court asked Rodriguez (1) if he was "doing so freely and voluntarily without threats or promises of any kind from anyone," (2) if he "had an ample opportunity to confer with [his] counsel and explore all factual and legal issues in the case before rendering [his] decision," and (3) whether he "ha[d] any questions." (*Id.* at 53.) Rodriguez answered in the affirmative to the first two questions and in the negative to the last question. (*Id.*)

Later, at his post-conviction evidentiary hearing, Rodriguez testified that he and Lunt discussed "the possibility of [his] criminal record coming in" if he were to testify at trial and that they "disagreed on . . . whether or not the District Attorney could use that against [him] because it was prior bad act evidence." (ECF No. 24-12 at 29.) After Ohlson took over as counsel, Ohlson did not have any pretrial conversation with him about testifying at the trial, but after the State rested, Ohlson recommended that Rodriguez not testify. (*Id.* at 30-31.) Rodriguez testified that Ohlson explained that using Rodriguez's

law enforcement interview and explaining Rodriguez's defense during closing argument would be sufficient to present the defense's case. (*Id.*) Based on this advice, Rodriguez decided not to testify. (*Id.* at 32.) However, at the time of the post-conviction evidentiary hearing, Rodriguez testified that he believed "that there was information that [he] could have provided the jury that would have aided the jury in understanding that in [his] mind this was a crime of passion." (*Id.* at 34.) Indeed, according to Rodriguez, he would have testified about the following events that took place before he "lost it" the morning of July 9, 2012:

> It was a combination of everything, the threats against the children. During the fight that morning there was a lot of comments, a lot of threats made. And on our paper route, we always follow each other. That's our routine, gas station, highway to work. Once we get to work we go our separate ways, but we always had our bluetooth headsets on.
> Even the morning of the 8th we were on those bluetooth headsets and this morning she was just ignoring it. And when I looked over and saw her on the phone, I assumed it was with [her affair partner] and at that point I just lost it. Everything came to a head in my mind of the threats against the girls, the threat of bringing him to the house, the threat of him being a drug dealer and just everything.

(*Id.* at 52.)

Ohlson testified at the post-conviction evidentiary hearing that (1) he explained to Rodriguez that he had an "absolute constitutional right to testify or to not testify" and if he chose "not to testify, then the Court w[ould] tell the jury that they cannot hold that against him," (2) if he chose to testify, "he may be questioned vigorously by the district attorney," (3) in his experience, "very few people accused of a criminal offense are capable of helping themselves through their testimony at trial . . . whether they are innocent or guilty," and (4) Rodriguez did not wish to testify. (ECF No. 24-12 at 100-01, 108-09, 113.)

### 2.    State Court Determination

In affirming the denial of Rodriguez's state postconviction petition, the Nevada Court of Appeals held:

> Rodriguez also claimed that counsel failed to properly advise him regarding his right to testify at trial. Rodriguez alleged that Mr. Ohlson did

13

not at any time discuss with him testifying or prepare him to testify. Rodriguez believed that Mr. Ohlson would address any issues with the State's evidence during closing arguments, and he claimed the outcome of his trial would have been different had he been able to "tell his story."

The district court conducted an evidentiary hearing regarding this claim and found that Rodriguez would have testified as follows: Rodriguez found out about the victim's extramarital affairs in the days leading up to her killing but had opted to work things out with her. Rodriguez and the victim worked for the same employer, would each take their own vehicles to work, and would speak to each other via phone. On the day of the killing, the victim did not answer her phone, which caused Rodriguez to believe she was speaking to a man she was having an affair with. Angered by this, Rodriguez intentionally crashed his vehicle into the victim's vehicle. Thereafter, Rodriguez and the victim engaged in an argument, during which time the victim threatened to call 9-1-1. Rodriguez then pulled out a firearm and shot the victim to death before shooting at bystanders who had stopped to help. Rodriguez testified he was in a "dream-like" state and experienced blackouts during the incident.

The district court's findings are supported by the record. The district court further found that Rodriguez's testimony about his lack of memory of the incident was not credible, and this court will not "evaluate the credibility of witnesses because that is the responsibility of the trier of fact." *Mitchell v. State,* 124 Nev. 807, 816, 192 P.3d 721, 727 (2008). Rodriguez's proffered testimony did not support a manslaughter verdict because it did not demonstrate that he shot the victim based on an "irresistible impulse of passion . . . caused by a serious and highly provoking injury, or attempted injury, sufficient to excite such passion in a reasonable person," *Allen v. State,* 98 Nev. 354, 356, 647 P.2d 389, 390-91 (1982), and that there lacked an interval of time between the provocation and the killing, *see* NRS 200.060. Accordingly, Rodriguez failed to demonstrate a reasonable probability of a different outcome at trial but for counsel's alleged errors. Therefore, we conclude that the district court did not err by denying this claim.

(ECF No. 24-35 at 4-6.)

### 3.    Analysis

"[A] defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." *Rock v. Arkansas*, 483 U.S. 44, 49 (1987). This decision of whether to testify on his own behalf is one "the accused has the ultimate authority to make." *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Given Rodriguez's answers to the trial court's canvass, it appears that Rodriguez's waiver of his right to testify was knowingly made, meaning Rodriguez fails to demonstrate that his trial counsel acted deficiently in this regard. *See Blackledge v. Allison*, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity.").

14

However, even if Rodriguez were able to demonstrate that Ohlson acted deficiently in this regard, the Nevada Court of Appeals reasonably determined that he failed to demonstrate that "there is a reasonable probability that . . . the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694. Indeed, as the Nevada Court of Appeals reasonably determined, Rodriguez's proffered testimony would not have supported a heat of passion defense under Nevada law because there was a sufficient interval of time between the provocation and the killing. *See* NRS § 200.060 ("[I]f there should appear to have been an interval between the assault or provocation given and the killing, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge and punished as murder.").

Rodriguez would have testified that Korinda had been having an affair with a drug dealer, had threatened to take their daughters away from him, and had stated that she was going to take their daughters to live at the drug dealer's house. However, this all took place before Rodriguez and Korinda even got into their respective vans on the morning of July 9, 2012. The parties then drove separately to the gas station and got onto the interstate. Although Rodriguez was seemingly upset during this period of time, the only alleged provocation that took place following the parties' argument at home was Rodriguez's belief that Korinda was talking on the phone with a man. Then, importantly, several minutes passed between the time of the car accident and Rodriguez killing Korinda. During this time, Rodriguez exited his van, spoke briefly with Costa, and retrieved his gun. This interval of time between the provocation—Korinda's threats made during the parties' argument at home before leaving for work—and her murder supports a finding that any provocation was sufficiently reduced, and that Rodriguez acted with premeditation.

Consequently, the Nevada Court of Appeals' determination that Rodriguez failed to show prejudice from his trial counsel's alleged deficiencies in advising him regarding

testifying constituted an objectively reasonable application of *Strickland*'s prejudice prong. Thus, Rodriguez is not entitled to federal habeas relief for ground 7a.

### C.      Ground 11b: Trial Court Allowed Prejudicial Character Evidence

In ground 11b, Rodriguez alleges that the trial court allowed prejudicial character evidence that he was a sex offender to be admitted at trial. (ECF No. 7 at 63.)

#### 1.      Background information

Rodriguez filed a pre-trial motion in limine, requesting the trial court not allow the State to "offer[ ] into evidence certain statements in which he refers to himself as a 'sex offender.'" (ECF No. 21-28.) The trial court denied the motion. At trial, before the State played Rodriguez's police interview, the trial court warned the jury that Rodriguez "recounts certain statements made by Korinda Rodriguez wherein she refers to [him] as a felon and a sex offender." (ECF No. 21-50 at 17-18.) The trial court then told the jury that "[t]his evidence is not being offered to show the defendant's bad character, and you should not consider it for that purpose." (*Id.*) Instead, the trial court explained that the jurors were only allowed to consider the evidence "for the limited purpose of showing motive, intent and malice regarding the charged crime." (*Id.*)

During his police interview, Rodriguez said that Korinda said to him, "fuck you, you're a sex offender," and "I'll just call the police on you and tell them you have a gun and you're a sex offender." (ECF No. 22-43 at 81-82.) Later, Rodriguez told the detectives that he knew he was a sex offender and that he might be isolated in jail because of his sex-offender status. (*Id.* at 94, 105.)

#### 2.      Standard

"[I]t [is] clear that the introduction of unduly prejudicial evidence could, in certain cases, violate the Due Process Clause." *Andrew v. White*, 604 U.S. 86, 96 (2025). However, "[a] habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005),

16

*as amended on reh'g*, 421 F.3d 1154 (9th Cir. 2005). "[C]laims deal[ing] with admission of evidence" are "issue[s] of state law," *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009), and "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764 (1990). Therefore, the issue before the Court is whether the admission of the evidence in question rendered the trial fundamentally unfair. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) ("Only if there are *no* permissible inference the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'" (emphasis in original)).

### 3.    State Court Determination

In affirming Rodriguez's judgment of conviction, the Nevada Supreme Court held:

> First, appellant contends that the district court committed manifest error by allowing the State to introduce evidence of a bad act. *See Ledbetter v. State,* 122 Nev. 252, 259, 129 P.3d 671, 676 (2006) ("A district court's decision to admit or exclude evidence under NRS 48.045(2) rests within its sound discretion and will not be reversed on appeal absent manifest error."). Appellant challenges a statement he made to law enforcement, wherein he explained that he shot his wife after she said, "I'll just call the police on you and tell them you have [a] gun and you're a sex offender," and similar statements. We are not convinced this evidence implicates NRS 48.045(2), given that the State did not attempt to prove that appellant was a sex offender for any purpose. Regardless, the record reflects that the district court conducted a hearing, concluded that these statements were relevant to appellant's motive, and gave an appropriate limiting instruction. *See Tavares v. State,* 117 Nev. 725, 731, 30 P. 3d 1128, 1131 (2001), *holding modified by Mclellan v. State*, 124 Nev. 263, 182 P.3d 106 (2008). We conclude that appellant fails to demonstrate that the district court committed manifest error.

(ECF No. 22-37 at 2-3.)

### 4.    Analysis

Although the jury hearing that Rodriguez was a sex offender was undoubtedly detrimental to his case, it cannot be determined that it rendered Rodriguez's trial fundamentally unfair in violation of due process. *See Estelle*, 502 U.S. at 70. First, as the Nevada Supreme Court reasonably noted, this evidence was admitted for the permissible

17

purpose under Nevada law of showing Rodriguez's motive for killing Korinda. *See* NRS § 48.045(2) ("Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive . . . ."). In fact, the State's theory, at least in part, was that Rodriguez killed Korinda because she threatened to withhold his children from him due to his sex-offender status. Second, even if the evidence had no permissible inference, the Court does not find that the introduction of these statements violated Rodriguez's due process rights because (1) the State did not highlight this evidence, having only played Rodriguez's police interview and not dwelling on this fact thereafter; (2) the statements were relatively isolated in assessing the police interview as a whole; (3) the trial court gave a preliminary limiting instruction, informing the jurors how to properly consider the evidence; and (4) there was strong evidence of Rodriguez's guilt. *See Hovey v. Ayers*, 458 F.3d 892, 923 (9th Cir. 2006) (explaining that "even if there are no permissible inferences the jury can draw from the evidence in question, due process is violated only if the evidence is 'of such quality as necessarily prevents a fair trial'" and reasoning that "[w]e have held that admission of far more inflammatory evidence did not violate due process").

Thus, because the Nevada Supreme Court's denial of Rodriguez's claim was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts, Rodriguez is not entitled to federal habeas relief for ground 11b.

## V.    CERTIFICATE OF APPEALABILITY

This is a final order adverse to Rodriguez. Rule 11 of the Rules Governing Section 2254 Cases requires the Court to issue or deny a Certificate of Appealability. The Court has *sua sponte* evaluated the claims within the Petition for suitability for the issuance of a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *see also Turner v. Calderon*, 281

F.3d 851, 864-65 (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a Certificate of Appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a Certificate of Appealability is appropriate only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the Court's procedural ruling was correct. *See id.*

The Court finds that a Certificate of Appealability is unwarranted.

**VI.    MOTION**

Rodriguez moves for the Court to mail him a copy of this Order because the law library does not always timely print documents, and he does not want to miss his appeal deadline. (ECF No. 46 ("Motion").) The Court finds good cause exists to grant this Motion.

**VII.    CONCLUSION**

It is therefore ordered that the Petition (ECF No. 7) is denied.

It is further ordered that a Certificate of Appealability is denied.

It is further ordered that the Motion (ECF No. 46) is granted.

It is further kindly ordered that the Clerk of Court (1) mail Rodriguez a copy of this Order at Northern Nevada Correctional Center, (2) enter judgment accordingly, and (3) close this case.

DATED THIS 13th Day of February 2026.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE

19